# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50275 | **DATE** | 6/25/2004 |
| **CASE TITLE** | Stitzer vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. The case is remanded. This court recommends the ALJ determine whether Plaintiff's petit mal seizures qualify her for disability at Step Three, and if not, this court recommends the ALJ consider establishing a new RFC. Defendant's Motion for Summary Judgment is denied

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

6-28-04
date docketed

docketing deputy initials

6/22/2004
date mailed notice

**Document Number**

17

| sp | courtroom deputy's initials | | Date/time received in central Clerk's Office | sp |
|---|---|---|---|---|
| | | | | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| LISA STITZER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 50275 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Lisa Stitzer ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on December 30, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for DIB on April 21, 2000, alleging disability on September 30, 1999. (Tr. 149). Plaintiff's application for benefits was denied on September 21, 2000. (Tr. 111). On October 24, 2000, Plaintiff filed a request for reconsideration. (Tr. 119). Plaintiff's request for reconsideration was denied on February 9, 2001. (Tr. 118). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on February 27, 2001. (Tr. 121). Plaintiff appeared, with counsel, before an ALJ on May 1, 2002. (Tr. 31). In a decision dated November 29, 2002, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 28). On January 23, 2003, Plaintiff

requested a review of the ALJ's decision by the Appeals Council. (Tr. 11). On May 22, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 10).

## II.  FACTS

Plaintiff was born June 9, 1962 and was thirty-nine years old at the time of her May 2002 hearing. (Tr. 46). Plaintiff graduated from high school but did not pursue any further education. Plaintiff testified she has trouble with reading and arithmetic but is able to write short messages and perform basic addition and subtraction. (Tr. 47). Additionally, Plaintiff stated that since March 2002 she could not drive due to a seizure she suffered in March 2002. Plaintiff's husband drove her to her May 2002 hearing. At the time of her hearing, Plaintiff was living with her husband and her teenage daughter. (*Id.*). Plaintiff suffers from asthma, seizure disorder, depression and anxiety. (Tr. 18). It is for these reasons, and some others, that Plaintiff claims to be disabled.

Plaintiff suffers from seizures. The severity of Plaintiff's seizures varies. In March 2002 Plaintiff suffered what she called a "grand mal seizure." (Tr. 49). In addition to the grand mal seizure, which appears to only happen once or twice a year, Plaintiff testified that she suffers from "petit mal seizures" a few times a week. (*Id.*). With a petit mal seizure, Plaintiff stated she just sits and stares while other times she physically jerks uncontrollably. (*Id.*). The petit mal seizures first started after Plaintiff's surgery in September 30, 1999. With regards to the grand mal seizures, Plaintiff stated she had one in 2002 (as of May 2002), two in 2001, two in 2000 and two in 1999. (Tr. 49-50).

Plaintiff's most recent job was performing home care for a Ms. Miller. From late 1997 to September 1999, Plaintiff testified that she would feed, bathe and generally take care of Ms. Miller. (Tr. 51). General care included such household duties as vacuuming and washing the dishes.

Plaintiff testified that her job at Ms. Miller's sometimes required lifting of fifty pounds or more. Plaintiff worked on the weekends for forty eight hours (Ms. Miller had another person during the week). A normal work day at Ms. Miller's would require Plaintiff to spend about twenty five percent of her time on her feet and the rest of the day sitting down. (Tr. 52).

Prior to working for Ms. Miller, Plaintiff performed general office work through a temporary service. Plaintiff's temporary jobs usually included filing, general reception work and data entry. (*Id.*). Plaintiff was usually not required to lift more than ten pounds at these jobs. (*Id.*). Plaintiff's temporary work required Plaintiff to sit for seven hours. (Tr. 53). Plaintiff testified that she would normally work about an hour before standing up to take a break. (*Id.*). When asked by the ALJ, Plaintiff stated that she cannot perform the above mentioned duties now because of her seizures, which Plaintiff stated prevent her from being able to concentrate and have created memory problems for Plaintiff. (*Id.*). Plaintiff was unable to clearly describe what she meant by memory problems when asked by the ALJ.

Prior to her temporary work, Plaintiff worked for a couple of months at Swiss Colony in 1997. (Tr. 54). At Swiss Colony, Plaintiff answered the telephone and did data-entry. (*Id.*). Plaintiff's job at Swiss Colony required no lifting or carrying but, like her temporary work, did require Plaintiff to sit for seven hours with hourly breaks. (Tr. 55).

Between 1993 and July 1996, Plaintiff worked for the Keen Company. (*Id.*). Plaintiff's job at the Keen Company consisted of data-entry, general customer service, general office work, filing and tracking packages. (*Id.*). Like her subsequent jobs, Plaintiff's job at Keen Company required no lifting or carrying but did require Plaintiff to sit for seven hours with occasional breaks. (*Id.*).

Between 1984 and 1993, Plaintiff worked as a transportation clerk for Sharp Electronic. (Tr.

56). At Sharp Electronic, Plaintiff performed data-entry and general customer service which consisted of telephone use and filing. (*Id*.). Plaintiff's job at Sharp Electronic required no lifting or carrying but, like her job at the Keen Company, did require Plaintiff to sit for seven hours with occasional breaks. (*Id*.).

A normal day for Plaintiff usually starts with her waking up around 6:30a.m. (Tr. 57). After waking, depending on the day, Plaintiff testified that she does simple housework such as sweeping, vacuuming (once a month), laundry (once a week), and grocery shopping. (*Id*.). Plaintiff does not visit friends or family or engage in hobbies. Additionally, on a normal day, Plaintiff will spend an hour or so on the internet. (Tr. 58). Plaintiff stated she does not watch television during the day, but instead, when not on the computer or doing housework, Plaintiff stated she just "sit[s] on the couch and maybe think about stuff." (*Id*.).

On a normal day, Plaintiff usually feels tired, fatigued and weak. According to Plaintiff, these physical feelings have been the same since her September 1999 accident. (*Id*.). Additionally, Plaintiff stated she suffers from tension and headaches and her bones ache all over her body. (Tr. 61). Plaintiff's headaches, like some of her other physical ailments, started after her 1999 surgery. These headaches, which Plaintiff described as migraines, occur a few times a month and last most of the day. (Tr. 62). Lastly, Plaintiff stated she suffers from anxiety type symptoms or depression on a daily basis. (Tr. 67).

Plaintiff's husband, Arthur Stitzer ("Mr. Stitzer"), appeared before the ALJ during Plaintiff's May 2002 hearing. (Tr. 87). Mr. Stitzer first testified about Plaintiff's grand mal seizures. Mr. Stitzer stated Plaintiff usually has a grand mal seizure "six, seven, eight times a month on an average, maybe one or two a week, almost always in the evening at night." (Tr. 88). When asked how he

knew the difference between a grand mal and a petit mal, Mr. Stitzer stated Plaintiff shakes all over and she loses control of her arms and legs. (*Id.*). Mr. Stitzer stated Plaintiff usually does not know she had a seizure. With regards to Plaintiff's petit mal seizures, Mr. Stitzer stated those usually occur during the day when he observes Plaintiff "space out for very briefs periods of time." (Tr. 89). According to Mr. Stitzer, Plaintiff's petit mal seizures occur "maybe on a monthly basis, eight, nine times, something like that." (*Id.*). With regards to daily activities, Mr. Stitzer testified that he does all the driving because Plaintiff is unable to drive due to her seizures. (Tr. 91). Additionally, Mr. Stitzer stated that he helps Plaintiff with the housework and occasionally with dinner. (*Id.*).

Vocational Expert, Christopher Yep, appeared before the ALJ during Plaintiff's May 2002 hearing. (Tr. 94). Mr. Yep first testified that Plaintiff's prior home care position would be an unskilled position performed at a medium level of exertion. (*Id.*). Plaintiff's general office work would be semi-skilled and her work as the traffic coordinator and transportation clerk would be skilled. (*Id.*). Both the general office work and the traffic coordinator and transportation clerk jobs would be performed at the sedentary level of exertion. (*Id.*). The ALJ then asked Mr. Yep to assume the following:

> I.'m going to ask you to assume a hypothetical female individual who is 39 years of age. ... Has a high school education with the ability to read, write, and use numbers. Let's say basic numbers. All right. Simple addition and subtraction. Has some prior work. The same prior work history as [Plaintiff] in this case with the capacity to perform work with the following and no other additional limitations. May perform a full range of work at all exertional levels, but must avoid concentrated exposure to allergens, concentrated exposure in the work place to allergens which would include pollen. I believe dog and cat hair and mold. ... And must also avoid exposure, or concentrated exposure to fumes, odors, dust, gases, and other pulmonary irritants. The individual must also avoid exposure to hazards such as exposed unprotected heights or excavations and

exposed unprotected dangerous machinery. And the individual may not operate a motor vehicle as part of assigned work duties.

(97-98). Based on the above, Mr. Yep stated that there would be no impact on past relevant work.

(Tr. 98). The ALJ next asked Mr. Yep to further assume the following modifications:

> [l]ifting and carrying is limited to up to 20 pounds on an occasional basis and ten pounds frequently with sitting, standing, and walking limited respectively and with normal breaks up to six hours each in an eight hour day. The individual may not climb ladders, ropes or scaffolds. May otherwise climb ramps and stairs, balance, stoop, kneel, crouch, and crawl on no more than occasion [sic] basis.

(Tr. 98-99). Based on the further limitations, Mr. Yep stated such an individual could not do the home care work. However, the individual could perform all of Plaintiff's other prior work. (Tr. 99) The ALJ then asked Mr. Yep to assume further the following modifications:

> All right. You are to assume further the individual does not possess the capacity to, let's say recall and carry out complex or detailed instructions, or to maintain such extended attention or concentration as would be required for the performance of complex or detailed tasks at a sustained workman like pace. The individual would however retain the capacity to understand, recall, and carry out short simple instructions and to focus upon and attend to and carry out simple tasks at a sustained workman like pace. Let's also, we didn't add in there that the individual should not have to perform more than minimum use of basic math skills.

(*Id.*). Based on the above, Mr. Yep stated that such limitations would eliminate the remainder of the prior work because of Plaintiff's remaining jobs were semi-skilled to skilled. (*Id.*).

Focusing on the area of unskilled work within the region of the State of Illinois, the ALJ asked Mr. Yep whether, based on the limitations stated above, an individual could perform any work. In response, Mr. Yep stated that, at both the sedentary and light level, the individual could perform

assembly (32,747 positions), sorting (12,228 positions) and packaging (22,371 positions). (Tr. 100). While the packaging position listed by Mr. Yep would only be light work, the assembly and sorting positions would be forty percent sedentary (approximately 12,800 positions and 4,800 positions respectively) and sixty percent light. (*Id.*).

Again, the ALJ asked Mr. Yep to further assume

> that lifting and carrying would be limited to ten pounds on an occasion [sic] basis and to lighter items such as small hand tools, individual case files, could be performed on a frequent basis. And let's further state that standing and walking would be limited to a combined total of two hours in an eight hour day.

(Tr. 101). Based on these last limitations, Mr. Yep stated such limitations would eliminate the packaging position and the light work assembly and sorting positions, but would not eliminate the sedentary assembly and sorting positions. (Tr. 101-102). The ALJ then asked Mr. Yep to assume further that

> standing and walking would be limited to let's say a maximum of 15 minutes continuously without being able to sit down for one or two minutes. It could still be up to two hours in an eight hour day, but 15 minutes continuously without being able to sit for a minute or two.

(Tr. 102). Mr. Yep stated that such further limitations would not effect the remaining jobs because they are primarily sedentary.

Finally, the ALJ asked Mr. Yep to assume, separate and apart from any previous hypothetical, the following:

> she cannot stand for any duration continuously .... That sitting is less than two hours in an eight hour day. Must be able to shift positions at will from sitting, standing, or walking. Would require unscheduled breaks at approximately 30 to 45 minute intervals. Would require rest periods, apparently at that for as long as one hour. Could lift less than ten pounds on an occasional basis. ... Can use the hands to grasp,

turn, and twist objects ten percent of the day. Use the fingers for fine manipulation ten percent of the day. Reaching, including overhead with the upper extremities for only five percent of the day. Can bend and twist at the waist five percent of the day. Also limited exposure to cold, extremes of heat and cold, high humidity, chemicals, solvents, cleaners, soldering fluxes, cigarette smoke, perfumes, fumes, odors, dust, and gases, pollen, dog and cat hair, and mold. And does not have the capacity to tolerate even low stress jobs.

(Tr. 103-104). Based on the above, Mr. Yep stated such individual could not perform Plaintiff's prior work or perform any of the previously mentioned sedentary jobs because of the restrictions on breaks and the ten percent use of the hands. (Tr. 104).

## III. __MEDICAL HISTORY__

In September 1999, while driving her car, Plaintiff began to realize that she could not move her right leg and had no sensation in her right leg. Plaintiff apparently blacked out and woke up after her car had gone off the road and rolled over. (Tr. 319). Plaintiff was brought to the Saint Anthony Medical Center Emergency Room in Rockford, Illinois. (*Id.*). A CAT scan of Plaintiff's brain was taken. The CAT scan revealed a "hyperdense mass in the left frontal lobe with a surrounding area of edema." (Tr. 321). Additionally, a localized mass effect with mild subfalcine herniation and compression of the lateral ventricle was noted. (*Id.*). No acute hemorrhage or hematoma was noted. (*Id.*). Contrast scans of Plaintiff's brain were then taken which revealed the mass in Plaintiff's left frontal lobe to be a large cerebral arteriovenous malformation ("AVM"). (Tr. 319).

After the CAT scan, Plaintiff saw Dr. M.M. Soriano. (*Id.*). Dr. Soriano's physical exam of Plaintiff revealed Plaintiff's Cranial nerves II through XII were intact, her lungs were clear, normal S1 and S2, and her reflexes, sensory and motor exam was normal. (*Id.*). Dr. Soriano's impressions of Plaintiff, based on his physical exam and Plaintiff's CAT scan, were that Plaintiff had a "giant

AVM." (*Id.*). Ultimately, Dr. Soriano ordered an ambulance transport Plaintiff to Dr. Gerald Brune at the University of Illinois, Chicago for treatment. (*Id.*).

On October 1, 1999, Plaintiff began testing at the University of Chicago, Illinois. (Tr. 307). Specifically, Plaintiff first had a Weinberg catheter positioned in her right common carotid artery. Selective injection showed filling of the distal common carotid, internal carotid artery cervical portion and external carotid artery. (*Id.*). An aneurysm was noted at the C2 level of the vertebral body measuring approximately 7 mm in diameter. The distal common and external carotid arteries appeared normal. (*Id.*). Another Weinberg catheter was placed in Plaintiff, this time in her right internal carotid artery. (*Id.*). Selective injection showed filling of the distal internal carotid and anterior middle cerebral arteries. A gross enlargement of the left anterior cerebral artery A2 segment and the pericallosal arteries was noted. The pericallosal artery measured approximately five times its normal size and had two fusiform aneurysms along its path. (*Id.*). Another Weinberg catheter was positioned in Plaintiff's left common carotid artery. (Tr. 308). Selective injection showed filling of the left carotid cervical circulation. (*Id.*). The distal common and external carotid arteries appeared normal and the left internal carotid artery appeared diffusely enlarged and tortuous. (*Id.*). A final Weinberg catheter was positioned in Plaintiff's left vertebral artery. (*Id*) Selective injection showed filling of the posterior circulation intracranially. (*Id.*). The left vertebral artery and basilar trunk were enlarged diffusely and some enlargement of the left posterior cerebral artery was noted. (*Id.*). In conclusion, radiologist Dr. Vicotr Aletich reported the cerebral angiography demonstrated a high flow arteriovenous fistula supplied predominantly by the left pericallosal artery in an antegrade manner. (Tr. 309). This finding, according to Dr. Aletich, was associated with diffuse enlargement of both carotid arteries as well as the vertebral arteries and basilar trunk. Multiple

aneurysms situated on both internal carotid arteries and the left pericallosal artery were also noted, presumably related to the increase flow. (*Id.*).

On October 5, 1999, Dr. John Hughes, of the University of Illinois at Chicago Medical Center's Department of Radiology, issued an electroencephalographic report. (Tr. 310). In his report, Dr. Hughes wrote the following:

> The background rhythm in this record consists of well organized and moderately well developed waves of 9 ½ to 10 per second bilaterally synchronous and symmetrical. Intermixed are 2 to 3 second waves on the left temporal area, diffuse 3 to 5 per second waves and slow transients on the right temporal area. ... IMPRESSION: The sharp waves on the temporal areas indicate the presence of discharging foci within those regions. In addition a moderate degree of focal slow wave abnormality was seen on the left temporal area and a mild to moderate degree on the right temporal area indicating a neurophysiological disturbance within those regions. Finally a mild to moderate degree of diffuse disorder is seen indicated a generalized cerebral involvement.

(*Id.*).

Also on October 5, 1999, Dr. Michael Thorton, of University of Illinois at Chicago's Medical Center, performed a cerebral angiogram and embolization of her left parenchymal arteriovenous fistula. (Tr. 312). Dr. Thorton reported that "two injections of pure glue were performed into the arteriovenous fistula fed from the left pericallosal artery. This resulted in apparent large decrease flow through the fistula." (*Id.*). The fistula, according to Dr. Thorton, remained patent and ultimately Dr. Thornton recommended Plaintiff incur another angiography in one month. (Tr. 315).

Plaintiff saw Dr. Rajeev Deveshwar, of University of Illinois at Chicago's Department of Radiology, for another cerebral angiogram. (Tr. 300). Dr. Deveshwar noted, after a Weinberg catheter was positioned in Plaintiff's right internal carotid artery, filling of the left anterior cerebral

artery which was enlarged and dilated in its A2 and A3 segments. (Tr. 301). Dr. Deveshwar then positioned the Weinberg catheter in Plaintiff's left common carotid artery. After doing this, an aneurysmal formation at the origin of the left external carotid artery was noted. (*Id.*). Finally, Dr. Deveshwar positioned the Weinberg catheter in Plaintiff's left internal carotid artery. Selective injection of the left internal carotid artery demonstrated an enlarged and dilated ACA on the left involving the A2 and A3 segments. (*Id.*). Additionally, Dr. Deveshwar noted lateral meningeal and pial collateral flow with filling of the venous side of the previously defined arterial venous fistula with a large pouch adjacent to the side of the fistulous communication. (*Id.*). Ultimately, Dr. Deveshwar's impressions were that a small residual fistulous communication persists which is fed principally by a left meningeal collateral from the pial collaterals of the middle cerebral artery. (*Id.*).

The very next day Dr. James Ausman, of the University of Illinois at Chicago, performed a craniotomy and occlusion of Plaintiff's fistula. (Tr. 295). The craniotomy consisted of Dr. Ausman using a 3M perforator to place bur holes anteriorly first and then posteriorly, and then connect them with a high speed Midas drill. (Tr. 296). Dr. Ausman then exposed Plaintiff's cerebral cortex, specifically the mesial aspect of the left frontal lobe was exposed and retracted. (*Id.*). Dr. Ausman proceeded with the dissection until the large ACA feeder, which was the major and almost exclusive feeder for the fistula, was seen. (*Id.*). The dissection then proceeded from proximal to distal towards Plaintiff's fistula. An area in the vessel was seen which was filled partly with glue. Dr. Ausman attempted to clip the vessel but the only possible site to do so was proximal to a cortical branch. (*Id.*). Further dissection revealed a large varix in the site where the varix were emptying into the superior sagittal sinus. (*Id.*). Dr. Ausman dissected the fistula further at this point. (*Id.*). Before Dr. Ausman could complete the procedure, Plaintiff was found to have a platelet count of

70,000 with the possibility of her developing heparin induced thrombocytepenia. Therefore, the procedure ended. (*Id.*).

A CT brain without contrast procedure was done on Plaintiff on November 19, 1999. (Tr. 293). The CT revealed a mild decreased density and size in Plaintiff's previously demonstrated left frontal hematoma. (*Id.*). However, air was still seen along the resection site on the left. Otherwise, no significant changes in Plaintiff's condition were seen. (*Id.*).

Also on November 19, 1999, Dr. Ausman wrote a letter to Dr. Soriano, Plaintiff's physician in Rockford. (Tr. 292). In his letter, Dr. Ausman wrote: "[Plaintiff] came into the hospital and had a midline arteriovenous fistula. We took her to surgery yesterday and coagulated all the feeders into the fistula and also what we thought was the vessel going into the fistula." (*Id.*). Ultimately, Dr. Ausman wrote that Plaintiff may have to undergo another angiogram after her surgery. (*Id.*). Plaintiff did undergo another procedure on November 24, 1999, but that one failed as well. (Tr. 276).

On November 20, 1999, Plaintiff had an MRI and MRA of her brain. (Tr. 290). Specifically, the MRI of Plaintiff's brain was performed utilizing sagittal T1, axial proton and T2, axial T1, and post Gadolinium T1 axial and coronal pulse sequences. (*Id.*). The MRA of the major intracranial vascular structures also was performed using 3D time of flight. (*Id.*). Plaintiff's MRI revealed low T1 and T2 signal intensity in her left high frontal lobe with surrounding hyperintense T1 and T2 signal consistent with acute and chronic blood. (Tr. 291). Additionally noted was a mild mass effect of the left lateral ventricle with mild shift of the midline to the right. (*Id.*). Plaintiff's MRA revealed that Plaintiff's previously noted large left anterior cerebral artery had decreased in size. (*Id.*). However, tortuosity of the vessel and tortuosity of the multiple left middle cerebral artery branches

were noted. (*Id.*).

Plaintiff underwent a speech/language assessment on November 26, 1999. (Tr. 276). Plaintiff was first tested on auditory verbal comprehension. She answered 15/15 yes/no questions correctly, was 35/35 correct with word recognition and 11/11 in sequential commands up to three steps. (*Id.*). With regards to repetition, Plaintiff was 10/10. Plaintiff was 20/20 in naming. Plaintiff was 7/8 in sentence completion for short sentences/paragraphs. (*Id.*). Plaintiff was also able to write her own name, address and several words to dictation. (*Id.*).

Plaintiff underwent the final stage of a multi-stage occlusion of her arteriovenous fistula on November 30, 1999. (Tr. 267). Dr. Ausman reported that prior attempts at this procedure had decreased the amount of flow to the AV fistula but with only minimal residual. (*Id.*). Unlike the prior procedure, Dr. Ausman was able to clip the varix with a curved #72 Sugita clip in attempt to stop the flow. (*Id.*).

Plaintiff underwent another CT brain scan without contrast on December 1, 1999. (Tr. 264). The CT scan revealed, as compared to the November 30, 1999 scan, left frontal postoperative changes. Specifically, surgical clips in the region obscured some parenchymal detail. Additionally, areas of both high density as well as areas of adema were noted in the left frontal lobe which extended to the deep left frontal area and anterior left corpus callosum. (*Id.*). Ultimately, no definite change in the overall amount of mass effect centered in the left frontal area was noted. (*Id.*).

On December 2, 1999, Dr. Hughes issued another electroencephalographic report. (Tr. 264). In his report, Dr. Hughes wrote the following:

> IMPRESSION: Compared to the previous record taken 2 months ago this record show a slight change in that more diffuse slow waves were seen and not a moderate degree of diffuse slow wave abnormality is

> noted indicating a generalized cerebral involvement. As before sharp
> waves were again seen but now only on the right temporal area
> indicated a discharging focus within that region. As before a
> moderate degree of slow wave abnormality is again seen on the left
> temporal area and a mild to moderate degree on the right temporal
> area indicated a neurophysiological disturbance within those regions.

(*Id.*).

Plaintiff underwent another speech/language assessment on December 7, 1999. (Tr. 241). As before, Plaintiff was first tested on auditory verbal comprehension. She answered 15/15 yes/no questions correctly, was 54/54 correct with word recognition and 11/11 in sequential commands up to three steps. (*Id.*). With regards to repetition, Plaintiff was 10/10. Plaintiff was 20/20 in naming and was able to name nine animals in one minute and four fruits in one minute. With regards to Plaintiff's cognitive memory, Plaintiff was 4/4 in immediate four word recall and 3/4 in delayed four word recall. (*Id.*).

Also on December 7, 1999, Plaintiff underwent an MRA of her cervical and intracranial vasculature and phase contrast study in conjunction with her neurosurgery. (Tr. 236). Plaintiff's MRA of her neck revealed normal caliber of the common carotid and internal carotid arteries. (*Id.*). Both vertebral arteries were normal in caliber also. (*Id.*). Plaintiff's MRA of her intracranial vasculature revealed normal caliber of the anterior and posterior circulation. (*Id.*).

Dr. Ausman wrote Dr. Soriano again on December 13, 1999. (Tr. 235). This time, Dr. Ausman wrote that "we were able to completely obliterate [Plaintiff's] AV fistula." (*Id.*). After numerous attempts to embolize and remove the feeders from Plaintiff's fistula, Dr. Ausman wrote it was occluded. (*Id.*). Ultimately, Dr. Ausman wrote "I think she will do well." (*Id.*). About a month later, Dr. Ausman wrote, in another letter to Dr. Soriano, that Plaintiff was improving. (Tr.

233). Specifically, Dr. Ausman wrote her AVM is completely treated and Plaintiff's only complaint was itching at the incision site. (*Id.*). Dr. Ausman also indicated Plaintiff was suffering from anxiety for which Dr. Ausman prescribed Neurontin. (*Id.*). Lastly, Dr. Ausman indicated Plaintiff complained of ankle pain from the accident for which Dr. Ausman recommended an orthopaedic surgeon in Rockford. (*Id.*).

Plaintiff saw an orthopaedic surgeon on January 18, 2000 in regards to her ankle. (Tr. 366). Dr. Philip Eckstrom, of the Monroe Clinic in Monroe, Wisconsin, took three x-rays of Plaintiff's right foot. (*Id.*). The x-rays revealed no acute fracture and Plaintiff's ankle mortise was intact. (*Id.*). A small posterior calcaneal spur was noted with a lucency across the base of the spur which, according to Dr. Eckstrom, could represent a fracture at that location. (*Id.*). Also, Dr. Eckstrom reported probable bipartite sesamoid adjacent to the first metatarsal head. (*Id.*).

Plaintiff returned to Saint Anthony Medical Center in Rockford on March 2, 2000 for an EEG. (Tr. 231). The reason for the EEG is that Mr. Stitzer notified Dr. Ausman that Plaintiff had an episode of numbness involving the right side of her nose, the right side of her cheek, and her right hand. (Tr. 232). While Mr. Stitzer stated the episode lasted forty five minutes, Plaintiff later stated it only lasted fifteen minutes. (*Id.*). Regardless, the hospital advised Plaintiff to have an EEG, which she did on March 2, 2000. The EEG revealed "an abnormal EEG due to sharp wave activity in the left frontal region that indicates the presence of a focus of cortical hyperexcitability but is not necessarily diagnostic of epilepsy." (Tr. 231).

On May 3, 2000, Dr. Ausman filled out neurological report and an epilepsy report for the Bureau of Disability Determination Services. (Tr. 209-212). On the neurological report, Dr. Ausman indicated Plaintiff has no sensory, reflex or motor changes as a result of her neurological

treatment. (Tr. 209). Additionally, Plaintiff's gait was normal and Plaintiff was able to ambulate more than 50 feet without assistance. (*Id.*). Plaintiff's manipulative abilities were intact. (Tr. 210). Plaintiff oriented as to time, person and place and Plaintiff indicated she was able to handle funds on her own behalf. (*Id.*). On the epilepsy report, Dr. Ausman indicated Plaintiff's EEG findings revealed left frontal sharp waves for which Plaintiff is taking Neurontin. (Tr. 211). With regards to major motor seizures, Dr. Ausman indicated Plaintiff has one to two seizures a month (although he reported he has never witnessed one), with the typical seizure effecting Plaintiff's face. (*Id.*). When asked to describe Plaintiff's ability to do work-related activities, Dr. Ausman indicated Plaintiff is not able to lift more then ten pounds, cannot drive and has difficulty with concentration. (Tr. 212).

Plaintiff filled out an Activities of Daily Living Questionnaire on May 19, 2000. (Tr. 166). On the Questionnaire, Plaintiff indicated she can perform the following household chores: cleaning, vacuuming, dusting and laundry. (*Id.*). In terms of some daily activities, Plaintiff indicated she often pays bill and does finances and she sometimes goes to church, watches television, talks on the phone and goes out to eat, but Plaintiff rarely drives, reads, watches children, fixes things, plays games, performs hobbies, goes to sports events, talks to neighbors, volunteers, goes to movies or goes to classes. (Tr. 168).

Plaintiff started to see Dr. Regina Bielkus, a neurologist, on June 12, 2000. (Tr. 444). Dr. Bielkus' examination revealed Plaintiff to be pleasant and in no acute distress. (*Id.*). Plaintiff's motor examination was normal and her strength was intact and symmetric in both upper and lower extremities. (*Id.*). Dr. Bielkus' impression were Plaintiff was suffering from a seizure disorder status post AVM resection. (Tr. 445). Plaintiff saw Dr. Bielkus again on July 12, 2000. (Tr. 443).

16

On that date, Dr. Bielkus reported Plaintiff was on Depakote 250 mg a day and Neurontin 400mg a day. (*Id.*). Dr. Bielkus reported that Plaintiff had not had any seizures since Plaintiff's June 12, 2000 visit and that Plaintiff was tolerating the medication well. (*Id.*). A CBC with differential and SGOT was unremarkable. Dr. Bielkus also indicated an examination revealed no evidence of nystagmus or ataxia. (*Id.*). Ultimately, Dr. Bielkus reported Plaintiff was stable on the current dosages of Depakote and Neurontin. (*Id.*).

Dr. Francis Vincent, a medical consultant on behalf of Disability Determination Services, assessed Plaintiff's physical residual functional capacity ("RFC") on September 15, 2000. (Tr. 213-219). Specifically, Dr. Vincent indicated Plaintiff has no exertional limitations, no manipulative limitations, no visual limitations, no communicative limitations and no environmental limitations except that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights. (Tr. 217). Additionally, Dr. Vincent noted that because "evidence does not substantiate weight restrictions" (tr. 218), Plaintiff is "capable of heavy work" with restrictions on heights and hazards. (Tr. 219).

Plaintiff saw Dr. Bielkus again on October 11, 2000. (Tr. 442). Dr. Bielkus indicated Plaintiff was still on Depakote and Neurontin without any side effects. (*Id.*). Plaintiff's CBC with differential and SGOT were again unremarkable. (*Id.*). An examination of Plaintiff by Dr. Bielkus revealed Plaintiff was alert and oriented, her speech was intact and she had no evidence of ataxia on "finger-finger nose." (*Id.*).

On December 20, 2000, Dr. Bielkus filled out, per the request of Disability Determination Services, a Stroke Residual Functional Capacity Questionnaire for Plaintiff. (Tr. 220). On the Questionnaire, Dr. Bielkus indicated Plaintiff's symptoms include the following: balance problems,

poor coordination, loss of manual dexterity, weakness, numbness, pain, fatigue, headaches, difficulty remembering, confusion, depression, personality change, difficulty solving problems, problems with judgment and speech/communication difficulties. (*Id.*). Dr. Bielkus also indicated, in response to a question on the Questionnaire, that Plaintiff's pain is constant and her impairments are expected to last at least twelve months. (Tr. 221). With regards to Plaintiff's functional limitations, Dr. Bielkus indicated Plaintiff can walk a block without rest, sit continuously for fifteen minutes, not stand for any length of time and sit for less than two hours in an eight hour workday with normal breaks. (*Id.*). Dr. Bielkus also reported that Plaintiff needs a job which permits shifting positions at will from sitting, standing or walking and that Plaintiff will sometimes need to take unscheduled breaks, usually every thirty to forty-five minutes. (Tr. 222). In terms of weight, Dr. Bielkus reported Plaintiff can lift less than ten pounds occasionally. (*Id.*). Plaintiff has significant limitations in doing repetitive reaching, handling or fingering, and in an eight hour day, Dr. Bielkus reported Plaintiff can use her hands to grasp and turn objects only ten percent of the time in an eight hour day, perform fine manipulations ten percent of the time in an eight hour day, and reach only five percent of the time in an eight hour day. (*Id.*). Dr. Bielkus reported Plaintiff should avoid exposure to extreme cold, extreme heat, high humidity, chemicals, solvents/cleaners, soldering fluxes, cigarette smoke, perfumes, fumes, odors and dust. (Tr. 224). Lastly, Dr. Bielkus indicated Plaintiff is incapable of even low stress jobs. (*Id.*).

Dr. Mark B. Langgut, a clinical psychologist, performed a clinical interview, a psychological consultation and a mental status examination of Plaintiff on January 5, 2001. (Tr. 435). Dr. Langgut's initial observations were that Plaintiff's speech was clear but hesitant and she had problems with comprehension and seemed to struggle with questions asked of her. (*Id.*). Dr.

Langgut's mental status examination/ psychological consultation revealed Plaintiff has feelings of depression, ranking seven on a one-to-ten scale with ten being the most extreme depression. (Tr. 437). Plaintiff's depressive symptoms include lethargy, sleep problems, anhedonia, decreased concentration, irritability and impaired decision making. (*Id.*). Plaintiff has moderate feeling of anxiety (again seven on a one-to-ten scale) and feels anxious about most things. (*Id.*). According to Dr. Langgut, Plaintiff's short-term memory was intact and her long-term memory was adequate. (*Id.*). Dr. Langgut also found Plaintiff's speed of thinking to be slowed while Plaintiff's thought processes were characterized by average coherence and a normal level of suggestibility. (Tr. 438). Plaintiff shifted topics with some difficulty and her insight into her own situation was impaired. (*Id.*). With regards to Plaintiff's responsibility, Dr. Langgut indicated Plaintiff demonstrated adequate judgment, responsibility and arithmetic reasoning skills as well as an ability to understand the effects of her actions on herself and others. (*Id.*). Ultimately, Dr. Langgut diagnosed Plaintiff as suffering from Dysthymic Disorder, Anxiety Disorder, NOS and Dementia post status head injury. (*Id.*).

Plaintiff saw Dr. T.R. Perry, of the Monroe Clinic, on March 21, 2001. (Tr. 330-332). Dr. Perry's neurological exam revealed Plaintiff was mildly anxious with fluent speech and good vocabulary. (Tr. 331). Plaintiff was alert, attentive and oriented and demonstrated good recent and remote memory on recitation of history. (*Id.*). Plaintiff's head and neck were normocephalic and Plaintiff's cranial nerves II - XII were intact. (*Id.*). Plaintiff's cerebellar movements (i.e. finger-to -nose, heel-to-shin, etc.) were intact. (*Id.*). Plaintiff's station and gait were normal. (*Id.*). Based on his observations, Dr. Perry stopped the Depakote medication and started Plaintiff on one enteric-coated baby aspirin a day due to Plaintiff's pseudoaneurysms. (Tr. 332). Dr. Perry also suggested

Plaintiff start Lamictal in the future as her preferred anti-seizure medication. (*Id.*).

Plaintiff underwent surgery again on her left internal carotid artery pseudoaneurysm on June 5, 2001 at the University of Illinois at Chicago Medical Center. (Tr. 413). Specifically, the operation consisted of a subluxation of Plaintiff's left temporomandibular joint and removal of rigid fixation. (*Id.*). Two days later, on June 7, 2001, again at the University of Illinois at Chicago Medical Center, Plaintiff underwent an MRI study of her brain with and without contrast. (Tr. 416). The MRI revealed a left frontal craniotomy site with resection of left posterior frontal lobe AVM. (Tr. 417). A hyperintense T2 signal was noted in the posterior frontal lobe extending anteriorly along the midline. (*Id.*). No evidence of mass effect or midline shift or extra-axial fluid collection was found and no evidence of acute ischemic infarction was noted. (*Id.*).

Plaintiff's counsel referred Plaintiff to Michelle Marino, M.A, QMRP, of Malcolm Eaton Enterprises, on January 7, 2003 for a vocational evaluation. (Tr. 524-533). Specifically, Plaintiff completed the McCarron-Dial Vocational Evaluation System ("MDS") which is used to objectively and effectively predict vocational competency based on five different measures: verbal-cognitive as measured by the Peabody Picture Vocabulary Test ("PPVT"), sensory as measured by the Bender Visual Motor Gestalt Test ("BVMGT"), gross motor coordination as measured by the McCarron Assessment of Neuromuscular Development ("MAND"), integration-coping as measured by the Street Survival Skills Questionnaire ("SSSQ") and the Behavior Rating Scale ("BRS") and emotional as measured by the Emotional Behavioral Checklist ("EBC"). (Tr. 525).

Ms. Marino first addressed the MAND. The MAND was designed to assess fine and gross motor abilities. The fine motor portion of the MAND includes the following subtests: 1) beads in a box; 2) beads on rod; 3) finger tapping; 4) nut and bolt; and 5) rod slide. (*Id.*). The gross motor

portion includes the following subtests: 1) hand strength; 2) finger-nose-finger; 3) jumping; 4) heel-to-toe walk; and 5) standing on one foot. Ms. Marino indicated Plaintiff was unable to complete the jumping subtest because of her severe lack of lower body balance and coordination. (*Id.*). Additionally, Ms. Marino noted Plaintiff completed the tasks on the MAND with significant pain and discomfort. (Tr. 526). Overall, according to Ms. Marino, Plaintiff obtained a fine motor standard score of 15, a gross motor standard score of 32 and a total standard score of 44 as compared to the general population mean of 100 (Ms. Marino indicated the general population would be expected to score anywhere from 85 to 115). (*Id.*). According to Ms. Marino, the MDS indicates that "individuals within this range (i.e. 44) have difficulty performing even the simplest motor activities related to work." (*Id.*). Plaintiff had weakness with bimanual speed and coordination, right fine motor speed, left fine motor speed and left upper body strength. (Tr. 527). Ms. Marino also reported Plaintiff had severe weakness in left side balance, right side balance, lower body coordination and balance with eyes closed. (*Id.*).

Next was the PPVT. (Tr. 528). The PPVT is an individually administered test of receptive vocabulary where the examinee's task is to select a picture which best illustrates the meaning of a stimulus word spoken by the examiner. (*Id.*). Plaintiff obtained a standard score of 80 where the general population average score is measured as 100. Ultimately, Plaintiff's score fell within the "moderately low score" range with a percentile rank of 9%. (*Id.*). According to Ms. Marino, the MDS indicates that

> individuals scoring a factor standard score of 79-85 have verbal-spatial-cognitive skills associated with the community level of employment. Individuals within the lower spectrum ... are generally capable of reading and writing at a minimum fourth grade level. These individuals have little or no difficulty in transferring skills,

> making precise measurements, telling time, handling money or
> improving their skills with experience. They have the capacity to
> understand analogies and form concepts from their experience.

(*Id.*).

Ms. Marino performed the BVMGT next. The BVMGT is administered to test visual motor integration, attention to visual detail, and organization of the work environment. (*Id.*). The examinee is asked to copy a series of 9 drawings which are presented by the examiner after which the examiner rates these items for errors on the following attributes: distortion, disproportion, integration, perseveration and rotation. (*Id.*). Plaintiff made 0 out of 30 errors possible. This corresponds to a score of 100 as compared to the general population mean of 100. Thus, Ms. Marino reported "It appears that [Plaintiff] does not display any visual-motor integration difficulties." (*Id.*).

The HVDT was next. The HVDT is an instrument used to measure an individual's haptic visual sensory integration skills. This instrument is useful in identifying moderate to severe neurological dysfunctions. (*Id.*). The HDVT requires the examinee to identify in a tactile manner dimensions including size, shape, texture and configuration with first the left hand and then the right hand. (*Id.*). Plaintiff obtained a standard score of 78 with her right hand and a standard score of 81 with her left. Plaintiff's total average was 79 as compared to the general population mean of 100. (Tr. 529). The Sensory factor is comprised of both the BVMGT and the HVDT. Plaintiff's overall Sensory factor score was 89.7. According to Ms. Marino, the MDS indicates that "individuals scoring a Sensory factor standard score of 86 to 94 have tactile-visual and kinesthetic sensory perception at the community level of vocational functioning. They tend to receive information well and accurately perceive their environment. They tend to acquire or learn new tasks more rapidly than average." (*Id.*).

The SSSQ was next. The SSSQ is an adaptive behavior rating scale which evaluates an individual's functional knowledge and skills important for independent living in the community. (*Id.*). The SSSQ assesses adaptive behaviors in nine areas of daily living: basic concepts, functional signs, tools, domestics, health and safety, public services, time, monetary concepts and measurements. (*Id.*). Ms. Marino reported Plaintiff scored average to above average on the SSSQ.

Next, in order to gain a more comprehensive understanding of the "debilitating behavioral and emotional effects which [Plaintiff's] medical condition appears to have created," Plaintiff completed the BRS. (*Id.*). The BRS is used to provide an assessment of personal, social and work adjustment behaviors that relate to vocational placement, adjustment to work and personal-social adjustment. (*Id.*). Plaintiff obtained a standard score of 48 with a standard score of 100 being at the general population mean. Ms. Marino reported specific behaviors which reflect Plaintiff's relative strength include: demonstration of good table manners, dressing neatly and appropriately for the situation, the ability to recognize and name colors, understanding time concepts and number concepts. (*Id.*). On the other hand, specific behaviors which require intervention include restrictions of physical stamina for lifting or prolonged standing, the ability to stand up to stressful situations, the ability to travel independently, and the ability to handle living arrangements independently. (Tr. 530).

Lastly, the EBC. The EBC is an assessment instrument used to determine emotional and social effectiveness. (*Id.*). The EBC identifies the frequency of observed behaviors which include the following factors: impulsivity, anxiety depression, socialization, self-concept, aggression and reality orientation. (*Id.*). Ms. Marino reported the EBC indicated Plaintiff experienced several significant emotional problems. The EBC indicated a standard score of 37 with a standard score of

100 being at the general population mean. According to Ms. Marino, the MDS indicates that "individuals with an Emotional standard score of 49 and below may have severe emotional problems which require immediate intervention." (*Id.*). Additionally, Ms. Marino indicated that during her four hour administration of the MDS she witnessed the following behavioral factors by Plaintiff: impulsivity, anxiety, depression, self concept and reality disorientation. (*Id.*).

Overall, Plaintiff's MDS factor score was 53.3. This score, according to Ms. Marino, placed Plaintiff in the "low extended work training/prevocational competency range." (Tr. 531). In terms of areas of greatest need to improve her functioning and level of vocational competency, Ms. Marino reported the MDS indicated the following in order of priority: 1) gross and fine motor skills; 2) emotional/coping skills; 3) sensory abilities; and 4) verbal abilities. (*Id.*).

In summary, based on review of the collateral medical documentation and the results of the MDS, Ms. Marino opined Plaintiff "is unable to maintain supportive nor competitive employment at the current time." (Tr. 532). An individual must demonstrate an overall score of 70 to be considered potentially successful for employment, whereas Plaintiff's score of 53.3 places her well below that minimum number. (*Id.*).

## IV.   STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case

24

accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993), *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986), cert. denied. "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.  FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and

accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work

----

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any

substantial gainful activity at any time relevant to his decision issued on November 29, 2002. (Tr.

18). Specifically, the ALJ stated "[t]here is no evidence of work after the alleged onset date in this

case." (Id.).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the

claimant's earnings averaged more than seven hundred and eighty dollars per month for years after

January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29,

2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and

the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the

Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe

impairments. Specifically, the ALJ found the impairments in issue are asthma, fracture of the left

ankle, status post repair of asteriovenous fistula, pseudoanverysms right and left, seizure disorder,

depression and anxiety. (Id.).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from

severe impairments. This finding is not challenged by either party and the court finds no reason to

disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment

in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments

do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (*Id.*). Specifically, the ALJ found Plaintiff's asthma is under control and Plaintiff has not had any attacks despite prescribed treatment as required under Listing 3.03. Additionally, the ALJ found Plaintiff's seizure condition appears well controlled with medication and thus does not satisfy Listing 11.02, 11.03 or 11.04. (*Id.*). Finally, with regards to the severity of Plaintiff's mental impairment (i.e. depression and anxiety) the ALJ found that, under Listing 12.04 and 12.06, Plaintiff has mild limitation in her performance of activities of daily living and in maintaining social functioning and moderate limitation in maintaining concentration, persistence and pace. (Tr. 19). Therefore, with no evidence of decompensation and no "C" criteria met, the ALJ found Plaintiff did not satisfy any of the Listings with regards to her depression and anxiety.

This court has some concerns with the ALJ's conclusion at Step Three with regards to Plaintiff's seizure disorder. Specifically, this court is confused with the ALJ's statement that Plaintiff's "seizure condition appears well controlled with medication, ... ." (Tr. 18). However, this court will proceed through Step Five at which time it will fully discuss its concerns with the ALJ's statement at Step Three.

D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?

Before proceeding to Step Four, the ALJ first needed to determine Plaintiff's RFC. In determining a mental RFC, the first step in the procedure is to assess the nature and extent of the claimant's mental limitations and restrictions (20 C.F.R. § 416.945 (c)). This information is then used to determine the Mental RFC. In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the

impairment over a period of time.(20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1 12.00 (d)).

This information is then used to complete claimant's vocational assessment. After considering

Plaintiff's entire medical record, including Plaintiff's allegations of disabling symptoms, the ALJ

found Plaintiff's medically determinable impairments precluded the following:

> lifting/carrying up to 10 pounds more than occasionally, and lifting
> lighter items such as small hand tools and individual case files more
> than frequently; standing and/or walking for more than a combined
> total of 2 hours in an eight hour day, or for longer than 15 minutes
> continuously without being able to sit for 1 to 2 minutes; sitting, with
> normal breaks, for more than 6 hours in an eight hour day; may not
> climb ladders, ropes, or scaffolds; but, may otherwise climb ramps
> and/or stairs, balance, stoop, kneel, crouch, or crawl no more than
> occasionally; must avoid concentrated exposure, in the workplace, to
> the following allergens: pollen, molds, dog and cat hair; must avoid
> concentrated exposure, in the work place, to extremes of heat, cold,
> and humidity; and must avoid concentrated exposure, in the work
> place, to fumes, odors, dusts, gases and other pulmonary irritants;
> must avoid exposure to hazards, such as exposed-unprotected heights,
> excavations and dangerous machinery; may not drive a motor vehicle
> in the performance of assigned duties; and, does, not possess the
> capacity to recall, and carry out complex or detailed instructions or to
> maintain such extended attention and concentration as is required for
> the performance of complex or detailed tasks at the sustained
> workmanlike pace, but retains capacity to understand, recall and carry
> out short simple instructions, and to focus upon, attend to and carry
> out simple tasks at a sustained workmanlike pace; and, may not
> perform work which requires more than minimal use of basic math.

(Tr. 19). Based on the above limitations, the ALJ found that Plaintiff cannot perform any past

relevant work because even Plaintiff's least demanding past relevant job required her to perform

work activities inconsistent with the RFC determined above. (Tr. 26). This court agrees.

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and

the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the

Analysis is affirmed.  (*Id.*).

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that although Plaintiff's RFC did not allow her to perform the full range of light work, there existed a significant number of jobs in the national economy that Plaintiff can perform.  Before proceeding, the ALJ first noted that Plaintiff's past relevant work ranged from semi-skilled sedentary to heavy to medium unskilled.  (*Id.*).  Based on Plaintiff's RFC, the ALJ determined Plaintiff can perform a limited range of sedentary work.  (*Id.*).  Specifically, the ALJ, with assistance from a vocational expert, determined that Plaintiff can perform the following unskilled sedentary jobs: assembler and sorter.  Additionally, the ALJ noted that, "[a]ccording to the vocational expert, if (as the [Plaintiff] and her husband testified) an individual would be off task a few times per week for less than one minute on average (*due to petit mal seizures*), the above jobs would remain."  (*Id.*)(emphasis added).  Therefore, although the Plaintiff's limitations prevent Plaintiff from performing a full range of sedentary work, there still exists a significant number of jobs remaining that Plaintiff can perform at the limited sedentary range.  (*Id.*).

This court now addresses its concerns at Step Three and Step Five.  This court starts with the most logical starting point – the Listings.  Specifically, putting aside all Plaintiff's other ailments, this court focuses on the Listings for seizure disorders.  Section 11.00 (Neurological) provides, in pertinent part:

> A.  *Convulsive disorders.*  In convulsive disorders, regardless of
> etiology degree of impairment will be determined according to type,
> frequency, duration, and sequelae of seizures.  At least one detailed
> description of a typical seizure is required.  Such description includes
> the presence or absence of aura, tongue bites, sphincter control,

injuries associated with the attack, and postictal phenomena. The reporting physician should indicated the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

... Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed anticonvulsive treatment. Adherence to prescribed anticonvulsive therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment ... .

... Section 11.02 *Epilepsy – major motor seizures, (grand mal or psychomotor), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months prescribed treatment.* With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

*Section 11.03 Epilepsy – Minor motor seizures (petit mal, pscyhomotor, or focal), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.* With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

At Step Three, the ALJ concluded Plaintiff did not fit the criteria listed above because "as her seizure disorder appears well controlled with medication, this condition does not satisfy section 11.02, 11.03 or 11.04." (Tr. 18). However, this statement seems contradictory given the ALJ's statement that Plaintiff can perform substantial gainful activity even if she "would be off task a few times per week for less than one minute on average (due to petit mal seizures), ... ." (Tr. 26). There appears to be a problem. First, and foremost, the ALJ failed to thoroughly analyze Plaintiff's seizure disorder at Step Three. As this court has stated, in adherence to the Seventh Circuit, the ALJ must

build a "logical bridge from evidence to conclusion." *See Elliot v. Barnhart*, 2003 WL 21696198, at *15 (N.D. Ill. July 18, 2003)(citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). There is nothing logical about the ALJ's conclusions. If Plaintiff's seizure disorder is controlled by medication, then why inquire of the vocational expert the hypothetical of a person who suffers petit mal seizures "a few times a week." Even more troublesome is if, as the ALJ appears to have alluded to, Plaintiff does suffer petit mal seizures a few times a week for less than one minute on average, then why is Plaintiff not disabled at Step Three. Specifically, if the ALJ is concerned about an individual being off task a few times (few assumingly meaning at least two) a week due to petit mal seizures then it would seem that Plaintiff is suffering from petit mal seizures more frequently than once weekly in spite of at least 3 months of prescribed treatment. Why does Plaintiff not then satisfy Listing 11.03? Again, this court does not know the answer because the ALJ concluded Plaintiff does not satisfy Listing 11.02, 11.03 or 11.04 because her seizures are controlled by medication even though all the evidence seems to the contrary, given Plaintiff's own testimony (Tr. 49), that of her husbands (Tr. 89), numerous doctors (Tr. 211, 220, 225, 230, 231 and 423) and the hypothetical given to the vocational expert.

Plaintiff's testimony regarding her seizures, as well as her husbands testimony regarding Plaintiff's seizures, is consistent with the medical treatment and medical condition of Plaintiff. Specifically, Dr. Bielkus, one of Plaintiff's neurologists, reported Plaintiff suffers from the following as a result of her conditions: balance problems, poor coordination, loss of manual dexterity, weakness, numbness, pain, fatigue, headaches, difficulty remembering, confusion, depression, personality change, difficulty solving problems, problems with judgment and speech/communication difficulties. (Tr. 220). Dr. Bielkus also indicated Plaintiff's pain is constant and her impairments

34

are expected to last at least twelve months. (Tr. 221). With regards to Plaintiff's functional limitations, Dr. Bielkus indicated Plaintiff can walk a block without rest, sit continuously for fifteen minutes, not stand for any length of time and sit for less than two hours in an eight hour workday with normal breaks. (*Id.*). In terms of weight, Dr. Bielkus reported Plaintiff can lift less than ten pounds occasionally. (Tr. 222). Plaintiff also has significant limitations in doing repetitive reaching, handling or fingering, and Dr. Bielkus reported Plaintiff can use her hands to grasp and turn objects only ten percent of the time in an eight hour day, perform fine manipulations ten percent of the time in an eight hour day, and reach only five percent of the time in an eight hour day. (*Id.*). Lastly, Dr. Bielkus indicated Plaintiff is incapable of even low stress jobs. (Tr. 224). Dr. Bielkus' report is consistent with Plaintiff's testimony.

Moreover, on one instance, Plaintiff claimed to have experienced a seizure and after being examined at Saint Anthony Medical Center on March 2, 2000, an EEG revealed "an abnormal EEG due to sharp wave activity in the left frontal region that indicates the presence of a focus of cortical hyperexcitability but is not necessarily diagnostic of epilepsy." (Tr. 231). On another occasion, Dr. Ausman filled out a neurological report and epilepsy report on which he indicated Plaintiff is not able to lift more then ten pounds, cannot drive and has difficulty with concentration. (Tr. 212). The ALJ has put forward not a scintilla of evidence to justify setting aside Plaintiff's and her husband's testimony. The ALJ must point to the areas of the record which would support ignoring this testimony.

Finally, this court believes the ALJ should have the opportunity to evaluate the January 7, 2003 findings of Ms. Marino of Malcolm Eaton Enterprises. This report came two months after the ALJ's opinion and the Appeals Counsel ignored it on review. While this court does not designate

any weight to Ms. Marino's report, it does deserve consideration given its adverse findings to that of the ALJ's. (Tr. 532)("It would appear to his evaluator, based on review of the collateral medical documentation and in conjunction with the results of the McCarron Dial System, that [Plaintiff] is unable to maintain supportive nor competitive employment at the current time.")

## VII.    CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. The case is remanded. This court recommends the ALJ determine whether Plaintiff's petit mal seizures qualify her for disability at Step Three, and if not, this court recommends the ALJ consider establishing a new RFC. Defendant's Motion for Summary Judgment is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 6/25/04